**Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000588
10-NOV-2016
08:34 AM**

NOS. CAAP-15-0000907 and CAAP-15-0000588

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


JAMES DEMARCO and CHERYL DEMARCO, Plaintiffs-Appellants,
v.
MAUI BEACH RESORT LIMITED PARTNERSHIP, a Delaware limited
partnership; NORTHWEST MAUI CORPORATION, a Delaware corporation;
FIDELITY NATIONAL TITLE & ESCROW OF HAWAII, a Hawai'i
corporation; TITLE GUARANTY ESCROW SERVICES, INC., a Hawai'i
corporation, Defendants-Appellees,
and
DOES 1-10, inclusive, Defendants


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 10-1-1315)


MEMORANDUM OPINION
(By: Foley, Presiding J., and Fujise, J.
with Reifurth, J. concurring separately)

Plaintiffs-Appellants James DeMarco (**Mr. DeMarco**) and
Cheryl DeMarco (together, **the DeMarcos**) appeal from the (1)
"Order Granting Defendants Maui Beach Resort Limited Partnership
and Northwest Maui Corporation's Motion to Amend to Clarify and
Correct the Findings of Fact, Conclusions of Law, and Order,
Filed April 21, 2015" entered on July 27, 2015; (2) "Order
Granting in Part and Denying in Part Defendants Maui Beach Resort
Limited Partnership and Northwest Maui Corporation's Motion for
Attorneys' Fees and Costs, Filed August 20, 2015" entered on
November 3, 2015; and (3) "Amended Final Judgment" entered on

November 3, 2015 in the Circuit Court of the First Circuit[1] (**circuit court**).

On appeal, the DeMarcos contend the circuit court erred in (1) granting the motion to amend filed by Defendants-Appellees Maui Beach Resort Limited Partnership (**Maui Beach Resort**) and Northwest Maui Corporation (**NW Maui Corp.**) (together, **Appellees**) and modifying its Findings of Fact (**FOF**) and Conclusions of Law (**COL**) relating to Appellees' actual damages; (2) modifying its FOF/COL by deleting references to testimony from Appellees' witness Shannon Smith (**Smith**); (3) concluding that the DeMarcos were not consumers within the meaning of Hawaii Revised Statutes (**HRS**) 480-2 (2008 Repl.); (4) finding that "the existence of a sewage treatment plant was disclosed through numerous reports"; and (5) determining that the increased construction loan and the mechanic's lien application were not "material changes."[2]

## I. BACKGROUND[3]

In 2005, after the sale of Mr. DeMarco's interest in a company he founded, the DeMarcos' liquid assets totaled approximately $3.7 million. Between 2005 and 2009, the DeMarcos entered into sales contracts, and, in some instances, closed on sales agreements to purchase at least sixteen properties located in Utah, California, and Hawai'i. Together, the properties were worth an estimated $10.5 million, and the DeMarcos deposited an estimated $2.5 million for the properties.

Maui Beach Resort was one of the developers of a condominium resort project at Ka'anapali Beach on the island of Maui. NW Maui Corp. was the general partner of Maui Beach Resort.

---

[1] The Honorable Rhonda A. Nishimura presided.

[2] Although the DeMarcos include the circuit court's order awarding attorneys' fees and costs to Appellees in their notice of appeal, the DeMarcos do not raise any points of error in their opening brief regarding the circuit court's award of attorneys' fees. The DeMarcos have waived their challenge to the circuit court's award of attorneys' fees. See Hawai'i Rules of Appellate Procedure Rule 28(b)(7) ("Points not argued may be deemed waived.").

[3] This Background is taken primarily from undisputed FOFs in the circuit court's "Amended Findings of Fact, Conclusions of Law and Order" entered on July 27, 2015.

2

On December 14, 2005, the DeMarcos signed a sales contract with Appellees and their sales team, Playground Destination Properties, Inc. (**Playground**) for the purchase of a two-bedroom, two-bath condominium to be built as part the Hokulani Enclave portion of the Honua Kai development (**Hokulani Sales Contract**). The DeMarcos agreed to a purchase price of $985,000 with an initial deposit of $98,500 and a second deposit of $98,500 due June 30, 2006. The Hokulani Sales Contract read, in pertinent part:

ACKNOWLEDGMENT OF RECEIPT, OPPORTUNITY TO REVIEW, AND ACCEPTANCE OF PROJECT DOCUMENTS

THE FOLLOWING DOCUMENTS THAT ARE REFERRED TO IN THIS SALES CONTRACT FORM AN ESSENTIAL PART OF THIS SALES CONTRACT. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS RECEIVED COPIES OF EACH OF THE FOLLOWING DOCUMENTS AND THAT PURCHASER HAS HAD A FULL AND COMPLETE OPPORTUNITY TO READ, REVIEW AND EXAMINE EACH OF THE FOLLOWING DOCUMENTS:

1. the form of Sales Contract

2. the State of Hawaii Condominium Public Report(s)

3. the HUD Property Report

4. the Declaration of Condominium Property Regime of Honua Kai

5. the Bylaws of the Honua Kai Condominium Association

6. the form of Honua Kai Condominium Unit Deed with Reservations and Covenants

7. the Escrow Agreement

8. the Master Association Documents

9. the Articles of Incorporation of the Honua Kai Condominium Association

10. the Condominium Map

. . . .

D.35 Material Changes in the Project. If, prior to Closing, Purchaser, within thirty (30) days from the delivery by Seller of a copy of the Disclosure Documents containing a provision for Purchaser's written approval or acceptance, either personally or by registered or certified mail with return receipt requested, shall fail to execute and return to Seller the Disclosure Document with Purchaser's written approval or acceptance of any Material Change in the Project which Purchaser may do so without penalty, Seller may at its option either: (i) terminate this Sales Contract, and upon such

3

> termination, Seller shall cause Escrow to refund to Purchaser all Deposits previously made to Purchaser, without interest, or (ii) if Purchaser does not execute and return the Disclosure Document within thirty (30) days from the date of delivery of such document, Seller may deem Purchaser to have received such Disclosure Document and deem Purchaser to have waived Purchaser's right to cancel and to have approved and accepted such Material Change, all as provided in Section 514A-63, Hawaii Revised Statutes, provided that such receipt shall be effective only if at the time of the delivery of such Disclosure Document Purchaser is notified in writing of the fact that the Purchaser will be deemed to have approved and accepted the Material Change upon his or her failure to act within the thirty (30) day period.
>
> . . . .
>
> D.52. <u>Independent Investigation</u>. Purchaser acknowledges and agrees that it must independently investigate the use and character of all property adjacent to the Project and may not rely on any statements of any sales agent or any broker or any brochures or displays in the sales office about the use or character of any property other than the Condominium Unit.

(Emphasis and ellipses omitted.) Under the terms of the sales contract, "material change" was defined as:

> a change in the Project which (1) <u>directly, substantially and adversely affects the use or value of the Condominium Unit</u> or the Limited Common Elements appurtenant thereto or the amenities of the Project available for Purchaser's use, and (2) is not made pursuant to a right reserved to Seller under the Declaration.

The Condominium Public Report, referred to in the Hokulani Sales Contract, reserved to the developer the right to build the Honua Kai project in phases. Exhibit C, attached to the Condominium Public Report, read in relevant part:

> (G) As set forth in <u>Section 8.07 (Reserved Right to Construct the Condominium in Phases</u>) of the Declaration, Developer reserves the right to construct the Project in two or more phases. For further information, please refer to Exhibit D of this Contingent Final Public Report.

The Condominium Public Report also informed purchasers of blanket liens, and read:

> [The] land underlying the Project is presently subject to one mortgage and a financing statement made by the Developer and . . . the Developer intends to record a construction loan during the construction of the apartments being offered for sale under this Public Report. Such construction loan shall be in an amount not to exceed $185 million. Moreover, if the Developer Defaults or Lien is Foreclosed Prior to

> Conveyance the purchaser will be entitled to a refund
> of the deposits held in escrow.

(Brackets and ellipsis in original omitted.)

Maui Beach Resort provided prospective purchasers with a Property Report, dated November 29, 2005, which included a section entitled "Nuisances," and informed prospective purchasers:

> Hokulani and the Project as a whole, have been, and/or may continue to be, affected periodically by noise, dust, smoke, soot, ash, <u>odor</u>, noxious vapors, transmission of surface water runoff, or other adverse environmental conditions and nuisances, <u>including but not limited</u> to those attributable to wind drift and other weather factors attributable to (g) irrigation of any and all surrounding lands with reclaimed water, treated effluent, or other non-potable water sources.

(Ellipsis omitted.)  The Property Report also noted:

> [The] property on which Hokulani will be located is subject to a blanket lien in favor of Wachovia Bank and Wells Fargo Bank. N.A. (the 'Existing Mortgage') encumbers, in part, all Units in Hokulani and contains specific release provisions which will be exercised by the Developer in connection with its construction financing for Hokulani and if Developer default[s] on the Existing Mortgage prior to obtaining a release, you may not be able to complete your purchase of the Unit and you may lose any money you have paid for it.

(Ellipses and brackets omitted.)

The DeMarcos visited the Honua Kai development project in August 2006.  During their visit, the DeMarcos conducted an independent investigation of the properties adjacent to the Honua Kai development on the west, north, and south, but not to the east, where a sewage treatment plant was located.

Around August 31, 2006, the DeMarcos received a "Honua Kai Condominium Final Public Report Disclosure Statement" dated July 28, 2006, which, like other documents received by the DeMarcos, reiterated the developer's right to develop the Honua Kai project in phases.

On December 13, 2006, the DeMarcos entered into two additional sales contracts for Honua Kai condominium units in the Konea Enclave of the development (**Konea Sales Contracts**).  The DeMarcos contracted to pay $665,000 for one unit, depositing $133,000, and contracted to pay $835,000 for the second unit, depositing $167,000.  The Hokulani Sales Contract and Konea Sales

Contracts were virtually identical, but the Konea Sales Contracts included a subordination provision:

> 37.    Purchaser's Interest Under this Sales Contract Is to Be Subordinate to the Construction Loan.  Purchaser acknowledges that Seller intends to enter into an agreement with one or more construction lenders (the 'Construction Lender') pursuant to which the Construction Lender may loan an aggregate of up to Two Hundred Forty Two Million ($242,000,000).  To secure this loan, Seller will grant to the Construction Lender security interests covering Seller's interest in the Konea Enclave, including the Condominium Unit covered by this Sales Contract.  Purchaser acknowledges and agrees that all security interests obtained by the Construction Lender in connection with such loan as well as any extensions, renewals and modifications thereof shall be and remain at all times a lien or charge on the Konea Enclave, including the Condominium Unit covered by this Sales Contract, prior to and superior to any and all liens or charges on the Konea Enclave arising from this Sales Contract.

Around May 11, 2007, the DeMarcos received an amended public report for the Konea Enclave of the Honua Kai project, which informed purchasers of various liens and encumbrances on the property, and further, that the developer

> intends to record a new mortgage in an amount not to exceed $242,000,000 to finance the construction of the Konea Enclave which will act as a second mortgage on the Honua Kai Condominium until the release of the $338,000,000 construction loan is recorded as to the Konea Enclave and the Luana Enclave.

Around December 24, 2008, Maui Beach Resort sent purchasers a letter updating and summarizing information about the Honua Kai project since the issuance of the public reports. Attached to the letter was a copy of an application for a mechanic's lien filed against the Honua Kai project by Nordic Construction (**Nordic**), claiming that Nordic was due $8,500,000. Another attachment was a "Bond for Discharge of Mechanic's and Materialmen's Lien" filed by counsel for Maui Beach Resort, confirming that if a mechanic's lien were to attach to the Hokulani Enclave, Fidelity National Title Insurance Company was prepared to issue title insurance policies to owners of certain units within the Hokulani Enclave (**Fidelity Bond**).

Around the same time, Maui Beach Resort sent a second letter updating and summarizing information, amending the public reports.  Maui Beach Resorts informed purchasers that the

developers decided to build the Konea Enclave at once rather than in phases, which increased the construction finance required from $242 million to $305 million.

After receiving the reports from Maui Beach Resorts, the DeMarcos hired a California attorney because they were concerned about Nordic's application for a mechanic's lien and the Fidelity Bond. Counsel for the DeMarcos began contacting Maui Beach Resort about the DeMarcos' concerns.

By letter dated February 9, 2010, NW Maui Corp. informed the DeMarcos that their scheduled closing date for their Hokulani property had passed, and that because they had not closed on the property by January 22, 2009, they were in default of the Hokulani Sales Contract. The DeMarcos responded to Maui Beach Resort that the new liens for Nordic Construction and the other new encumbrances were "material changes" under the Hokulani Sales Contract, and the DeMarcos were entitled to terminate the contract under the terms of the Hokulani Sales Contract.

By letter dated March 4, 2010, NW Maui Corp. reminded the DeMarcos that their closing date for one of the Konea properties was approaching. By letters dated May 10, 2010, NW Maui Corp. notified the DeMarcos that they were in default of their obligations under the Konea Sales Contracts because they failed to close on the properties by the specified date.

The DeMarcos filed a complaint in the circuit court on June 15, 2010 for fraud, intentional and negligent misrepresentation, negligent supply of information to others, gross negligence, unfair and/or deceptive acts and practices, and breach of contract. Following a trial held between November 10, 2014 and November 24, 2014, the circuit court entered "Findings of Fact, Conclusions of Law and Order" (**FOF/COL**) on April 21, 2015 dismissing all of the DeMarcos' claims.

On May 1, 2015, Appellees filed "[Appellees'] Motion to Amend to Clarify and Correct the Findings of Fact, Conclusions of Law, and Order, Filed April 21, 2015" (**Motion to Amend**) The circuit court granted Appellees' motion and entered "Amended Findings of Fact, Conclusions of Law and Order" (**Amended FOF/COL**)

7

on July 27, 2015, which did not disturb its decisions to dismiss all of the DeMarcos' claims.

The circuit court entered its Final Judgment on August 10, 2015.

On August 19, 2015, the DeMarcos filed their notice of appeal from the circuit court's order granting Appellees' Motion to Amend its April 21, 2015 FOF/COL in case no. CAAP-15-0000588.

On August 20, 2015, Appellees filed a motion for attorneys' fees and costs, which the circuit court granted in part and denied in part.

On November 3, 2015, the circuit court entered its Amended Final Judgment that included an award of Appellees' attorneys' fees and costs in the amount of $249,264.93.

On November 25, 2015, the DeMarcos filed their notice of appeal from the circuit court's Amended Final Judgment and from the order granting Appellees attorneys' fees and costs in case no. CAAP-15-0000907.

On December 30, 2015, this court consolidated case nos. CAAP-15-0000588 and CAAP-15-0000907 under case no. CAAP-15-0000907 as they both involve the same underlying case and parties.

## II. STANDARD OF REVIEW

### A. Findings of Fact and Conclusions of Law

Appellate courts review FOFs under the clearly erroneous standard. Chun v. Bd. of Trs. of Emps.' Ret. Sys. of State of Hawai'i, 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005) (citing State v. Hutch, 75 Haw. 307, 328, 861 P.2d 11, 22 (1993)). "An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed." Chun, 106 Hawai'i at 430, 106 P.3d at 353 (citing Hutch, 75 Haw. at 328, 861 P.2d at 22. "An FOF is also clearly erroneous when the record lacks substantial evidence to support the finding." Leslie v. Estate of Tavares, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999) (internal quotation marks omitted) (quoting State v. Kotis, 91 Hawai'i 319, 329, 984 P.2d 78, 88 (1999)).

8

"Substantial evidence" is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Leslie, 91 Hawai'i at 399, 984 P.2d at 1225 (quoting Kotis, 91 Hawai'i at 328, 984 P.2d at 87).

COLs are reviewed under the right/wrong standard. Chun, 106 Hawai'i at 430, 106 P.2d at 353 (citing In re Estate of Holt, 75 Haw. 224, 232, 857 P.2d 1355, 1359 (1993)). "Under the right/wrong standard, this court examines the facts and answers the question without being required to give any weight to the trial court's answer to it." Leslie, 91 Hawai'i at 399, 984 P.2d at 1225 (internal quotation marks and brackets omitted) (quoting Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., Inc., 91 Hawai'i 224, 239, 982 P.2d 853, 868 (1999)).

**B.   Motion to Amend or Clarify**

Findings by the court may be amended by motion of a party within ten days of the entry of judgment. Hawai'i Rules of Civil Procedure (**HRCP**) Rule 52(b). "A trial court's decision to grant or deny a motion to amend is reviewed under the abuse of discretion standard." Kienker v. Bauer, 110 Hawai'i 97, 113, 129 P.3d 1125, 1141 (2006) (citing Roxas v. Marcos, 89 Hawai'i 91, 115, 969 P.2d 1209, 1233 (1998)).

### III.   DISCUSSION

**A.   Admission of Testimony from Erika Alm (Alm) on Actual Damages**

The DeMarcos challenge the circuit court's COL 33 in its Amended FOF/COL, which states: "33. [Appellees] (Developer) were entitled to retain [the Demarcos'] deposits as liquidated damages pursuant to Section D.40 of the Konea/Hokulani sales contracts." The DeMarcos contend the circuit court "made no [FOFs] that Appellees had suffered damages as a result of the [DeMarcos'] cancellation of their contracts and therefore, it was a mistake of law for the [circuit court] to allow the Appellees to retain [the DeMarcos'] deposits as liquidated damages."

The circuit court based COL 33 exclusively on the testimony of Alm, Senior Vice President of Global Sales for

Playground and Principal of PowerPlay Destination Properties (**PowerPlay**). Prior to trial, Appellees submitted a declaration from Alm, a portion of which read:

> 68. [Maui Beach Resort] terminated the DeMarcos' purchase and sale agreements as follows: Hokulani Unit 220 on March 1, 2010; Konea Unit 148 on June 7, 2010; and Konea Unit 215 on June 7, 2010.
>
> 69. Between 2008 (Honua Kai pre-construction prices) and the Spring of 2010 (when [Maui Beach Resort] terminated all three DeMarco contracts), the average [per square foot (PSF)] sale price at Honua Kai had decreased by approximately 17% (from approx. $1,136 PSF to approx. $950 PSF).
>
> 70. Given the approximate 17% reduction in value from the DeMarcos' pre-construction prices for all three units ($2,485,000) to the date of termination (Spring 2010), the approximate reduction of value on the DeMarcos' three units was approximately $422,450 ($2,485,000 x 17% = $422,450), not including closing costs, brokerage fees and other incidental costs.

(Citations to record omitted.) The DeMarcos sought to exclude part of Alm's testimony in the November 3, 2014 "[DeMarcos'] Motion in Limine No. 12 to Strike Excerpts From the Declaration of Erika Alm Dated October 28, 2014" (**MIL 12**). One of the arguments made in the DeMarcos' MIL 12 was that Alm's testimony constituted "impermissible expert opinion." The circuit court granted in part and reserved in part the DeMarcos' MIL 12. The circuit court's order states:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that [the DeMarcos' MIL 12] is GRANTED as to striking Paragraphs 68, 69, and 70 of the Trial Declaration of [Alm] only to the extent if [Alm] attempts to testify as to any reasonable relationship, and purports to provide opinion testimony.

At trial, the circuit court admitted controverted testimony from Alm[4] relating to the information contained in

---

[4] Alm testified at trial:

> A [(Alm)] So as part of my role both at Playground and Power Play I spend a majority of my time going through sales data, our sales data, the market sales data. I'm always looking at what our pricing is vis-a-vie the market, what our sales targets are, what the absorption are. This is what I live and breathe.
>
> So this specific chart [(referring to Exhibit CT)] is Honua Kai sales only. Just Honua Kai product. And this is between 2008 and 2014, and I'm taking the price per square
>
> (continued...)

10

[4] (...continued)
foot of the smaller, less expensive units.  So that's everything below one million.  And we started at four hundred thousand.  So four hundred thousand to one million priced per square foot.

. . . .

Q   . . . [I]f you imagine a line at May 2010, when all three contracts that the DeMarcos had signed were terminated by [Maui Beach Resort], did you determine what the value—approximately what the value per square foot of those units were?

A    Yes.  So the contracts were terminated March, June, and June.  As an average I chose May, and the average would have been $950 per square foot.  These are closed units starting at $1,136 per square foot.  And again these are Honua Kai closings only.  So we're showing an average decline from 1,136 to 950.

Q    Okay.  So is it the case that between December 2008 and—well, from the last time that the contracts were first entered into in the end of '05 and end of '06 to the time of termination, May 2010, did the value per square foot decrease by 17 percent?

A    Yes, it did.

Q    All right.  And were there other costs that arose as a result of the DeMarcos' default?

A    Yes.

Q    And what were those[?]

. . . .

A    Roughly there's a cost per sale on every single unit that's going to be marketing expense, sales expense, salary expense, operation expense, and we break that down to about $20,000 per unit.

Q    Okay.  So if we have three units, we're talking about another sixty thousand?

A    Correct.

Q    And then is there any other loss?

A    Yeah.  So the commission was paid out on the original sale.  And the commission worked is the Playground team that sold this, the internal team, was paid 1.5 percent and they were paid 70 percent of that 1.5 percent.  As well on this Hokulani 220 there was a co-broker, an external broker from another Playground team, and he was paid 1.5 percent.

Q    Okay.

(continued...)

11

paragraphs 68-70 in her trial declaration because the circuit court deemed that Alm's trial testimony was based on information gained as part of Alm's job, rather than as an expert in, for example, real estate valuation. However, the circuit court also struck part of Alm's testimony as it pertained to the relationship of actual damages to liquidated damages, in line with the circuit court's pre-trial ruling.

The DeMarcos argue that Alm's testimony was admitted into evidence in contravention of the circuit court's pre-trial ruling that Alm could not testify about her opinion or the reasonable relationship between actual and liquidated damages.

The question before us is whether Alm, as the Vice President of Global Sales for Playground and Principal of PowerPlay, could testify about the depreciation in value of the Honua Kai properties that constitute Appellees' actual damages.

The value of real estate is generally recognized to be opinion testimony. See City & Cty. of Honolulu v. Int'l Air Serv. Co., Ltd., 63 Haw. 322, 332, 628 P.2d 192, 200 (1981). While individual owners are typically presumed qualified to give their opinion as to the value of their land, the presumption does not extend to corporate owners and officers. Id. Corporate

---

[4](...continued)

A      He received 50 percent of that.

Q      All right. So the 17 percent amounted to 422 thousand--

A      Correct.

Q      --in decreased value for the three units?

A      Correct.

Q      And the commissions amounted to 33 thousand?

A      Correct.

Q      And the overhead for a 20 thousand unit you said is 60 thousand; correct?

A      Correct.

Q      And the total is 515 thousand?

A      That's correct.

12

officers are not qualified to testify as to the value of the corporation's real estate unless the officer is deemed an expert. Id. at 332-33, 628 P.2d at 200-01 (affirming a trial court's ruling that a corporate officer's opinion was not competent evidence of value of a property). It is undisputed that Alm was not offered as an expert witness.

Under the circuit court's own ruling on the DeMarcos' MIL 12, Alm was prohibited from testifying as to her opinion of the depreciation in value of the Honua Kai properties, and therefore, also precluded from testifying as to her opinion of the actual damages suffered by Appellees. The only type of testimony appropriate to establish Appellee's actual damages by way of the depreciation in value of the Honua Kai properties was through expert testimony, which Appellees did not offer. The circuit court improperly relied on Alm's testimony in concluding that Appellees' liquidated damages were reasonably related to their actual damages, and therefore, its conclusion was wrong. See Chun, 106 Hawai'i at 430, 106 P.2d at 353.

**B.    Reliance on the Smith Declaration**

The DeMarcos next challenge the circuit court's reliance on Smith, Appellees' expert, who was not called at trial but referenced in the circuit court's original FOF/COL. The circuit court's original FOF 120 summarized Smith's opinion and focused on whether there were "material changes" justifying the DeMarcos' rescission of the sales agreements. Following Appellee's Motion to Amend, the circuit court removed references to Smith in its Amended FOF/COL. In its Amended FOF/COL, the circuit court clarified, "The deletion of FOF Nos. 120 and 121 [regarding Smith's opinions] is not dispositive of the court's conclusions of law, the court finding that its conclusions of law were amply supported by its findings of fact."

The DeMarcos fail to cite to any COLs that were affected by the circuit court's deletion of references to Smith in its Amended FOF/COL. The DeMarcos argue that the circuit court "exceed[ed] its authority under HRCP [Rule] 52(b) by deleting the testimony of [Smith] on which it relied," but do not

explain why the deletion of testimony that was not presented at trial would be an abuse of the circuit court's discretion. Because it does not appear that any of the circuit court's amended COLs relied on Smith's testimony, the DeMarcos' argument is without merit.

C.    "Consumer" Under HRS § 480-2

The DeMarcos contend the circuit court erred in its COL 24, which stated, "[The DeMarcos] do not satisfy the definition of a 'consumer' and may not bring a cause of action under HRS Chapter 480-2."  HRS § 480-2 provides, in pertinent part:

> § 480-2 Unfair competition, practices, declared unlawful.  (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.
>
>      . . . .
>
>      (d) No person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section.

"Consumer" is defined in HRS chapter 480 as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment."  HRS § 480-1 (2008 Repl.).

The circuit court relied on Cieri v. Leticia Query Realty, Inc., 80 Hawai'i 54, 905 P.2d 29 (1995), in concluding that the DeMarcos were not "consumers" because the DeMarcos did not purchase the three Honua Kai properties for "personal, family or household purposes."  In Cieri, the Hawai'i Supreme Court described the legislative history behind HRS chapter 480.  See id. at 59-62, 905 P.2d at 34-37.  In enacting HRS § 480-2(d), the supreme court explained, "the legislature principally sought to preclude HRS § 480-2's applicability to private disputes between business persons."  Id. at 62, 905 P.2d at 37 (brackets and internal quotation marks omitted).  The Cieri court considered whether a couple who bought real estate with the intent to reside on the property were considered "consumers" within the meaning of HRS § 480-2(d) because they had made a "personal investment" in

14

real estate. Id. at 67-69, 905 P.2d at 42-44. The supreme court held,

> We believe that, as previously noted, real estate is, particularly in Hawai'i, both scarce and expensive. As a result, the purchase of real estate or a residence likely is the largest "investment" a person in Hawai'i may make in a lifetime.
>
> We further believe that . . . real estate may be purchased with an intent to reside on the parcel of property and, concurrently, with an intent to hold the property in anticipation of an appreciation in the parcel's resale value. Accordingly, absent legislative intent to the contrary, we believe the plain and obvious meaning of the term "personal investment" includes real estate or residences.

Id. at 67, 905 P.2d at 42. The supreme court cited legislative history of the statute to clarify that the addition of the word "personal" before "investment" was intended "to protect individual consumers, rather than businesses." Id. at 68, 905 P.2d at 43.

The DeMarcos argue on appeal that "there was substantial evidence in the record that the [DeMarcos] bought the units as a personal investment using their personal funds to be owned by the [DeMarcos] jointly." The DeMarcos also argue, "the evidence at Trial was that the [DeMarcos'] intent was to personally use the units. The [DeMarcos'] testimony at Trial was that they were not sure whether they were going to rent out the Honua Kai units or use them." (Citations to the record omitted.)

As plaintiffs, the DeMarcos bear the burden of proving that they are "consumers" within the meaning of HRS chapter 480. The DeMarcos' testimony does not prove that they purchased the Honua Kai properties with the intent to reside in them. The fact that the DeMarcos had purchased about a dozen properties across the United States within five years, three of which were on Maui, is evidence weighing against the conclusion that the DeMarcos intended to reside in one of the Honua Kai condos. Because they did not prove that they were "consumers" making a "personal investment" in real estate, the DeMarcos did not have standing to bring a claim based upon unfair or deceptive acts or practices under HRS § 480-2. See Ass'n of Apartment Owners of Newton Meadows ex rel. its Bd. of Dirs. v. Venture 15, Inc., 115 Hawai'i

15

232, 252-53, 167 P.3d 225, 245-46 (2007) (holding that an unincorporated association ·was not a natural person and therefore not a consumer within the meaning of HRS § 480-1, and did not have standing to bring an action under HRS § 480-2). The circuit court's conclusion that the DeMarcos were not "consumers" was not wrong. See Chun, 106 Hawai'i at 430, 106 P.2d at 353

## D. Adequate Disclosure of Sewage Treatment Plant

The DeMarcos next contend that the circuit court erred in its FOF 112 and COLs 4, 6, 11, 12, 30, 31, 32, which relate to Appellees' disclosure to the DeMarcos that there was a sewage treatment plant (**STP**) adjacent to the Honua Kai properties. The DeMarcos argue that the circuit court's Amended FOF/COL "fails to identify what documents that [the DeMarcos] allegedly received that disclosed the [STP] and that there were odors emanating from the [STP] on to Honua Kai."

The DeMarcos attempt to characterize Appellees' failure to expressly notify the DeMarcos of the existence of the STP as a violation of Appellees' duty to disclose, but ignore the circuit court's holding that the DeMarcos were under a duty to investigate the area surrounding the properties and failed to act in accordance with that duty. The circuit court's relevant findings were:

> 17. [The DeMarcos], principal broker Playground, and NW Maui Corp. executed the Hokulani Sales Contract. Pertinent to the issues hereunder are the following contract provisions:
>
> . . . .
>
> D.52. Independent Investigation. Purchaser acknowledges and agrees that it must independently investigate the use and character of all property adjacent to the Project and may not rely on any statements of any sales agent or any broker or any brochures or displays in the sales office about the use or character of any property other than the Condominium Unit.
>
> . . . .
>
> 24. Prior to executing the sales contract for any Hokulani condominium units, Maui Beach Resort provided to prospective purchasers a copy of their 11/29/05 Property Report, which states in bold face, "READ THIS PROPERTY REPORT BEFORE SIGNING ANYTHING." Contained therein is a section entitled, "Utilities," informing prospective

16

purchasers that the "Units in Hokulani will be served by a central sewage disposal system. The existing sanitary sewer main is located adjacent to the Project in Lower Honoapiilani Road. The owner and operator of the central sewage disposal system is the County of Maui." There is also a section entitled "Nuisances," informing prospective purchasers that:

> Hokulani and the Project as a whole, have been, and/or may continue to be, affected periodically by noise, dust, smoke, soot, ash, odor, noxious vapors, transmission of surface water runoff, or other adverse environmental conditions and nuisances, including but not limited to those attributable to wind drift and other weather factors attributable to . . . (g) irrigation of any and all surrounding lands with reclaimed water, treated effluent, or other non-potable water sources.

> . . . .

> 28. The entrance to the STP is immediately across the intersection from Lower Honoapi'ilani Road. The entrance to the STP is marked by a readily noticeable sign that read: "TRASH COLLECTION" and "LAHAINA RECLAMATION FACILITY. ALL VISITORS MUST CHECK IN AT CONTROL BUILDING."

> . . . .

> 33. The STP is a fairly large facility, sited on a considerable tract of land, readily visible as one drives along Honoapi'ilani Highway. The STP had been operating at the same location for over thirty (30) years prior to [the DeMarcos'] visit.

> . . . .

> 35. During their 8/12/06 visit to the Honua Kai project, [the DeMarcos] conducted an independent investigation of adjacent properties west of Honua Kai (i.e., the beach), north of Honua Kai (i.e., hotel properties) and south of Honua Kai (i.e., hotel properties). [The DeMarcos] did not investigate adjacent properties to the east of Honua Kai. It was Mr. DeMarco's position that the only adjacent property to the east of Honua Kai was Honoapi'ilani Highway, and since the STP was not a property immediately adjacent to Honua Kai, there was no duty to conduct an independent investigation of the STP.

> 36. This court finds Mr. DeMarco's testimony less than credible regarding the STP not being adjacent to the Honua Kai Project and the STP's visibility or lack thereof from his vantage point while traveling along Honoapi'ilani Highway.

The DeMarcos do not challenge these FOFs on appeal.

The DeMarcos cite no legal or contractual obligation for Appellees to disclose more information to the DeMarcos than they did, or any evidence that would undermine their contractual obligation to inspect the areas around their properties. We have no reason to conclude that the circuit court's FOFs were clearly

17

erroneous or that the circuit court's COLs were wrongly decided. See Chun, 106 Hawai'i at 430, 106 P.3d at 353.

**E.    Recision of Sales Contract for "Material Changes"**

Finally, the DeMarcos contend the circuit court erred in its Amended COLs 26-32[5] concluding that the increased

_____

[5] The circuit court's COLs state:

**Breach of Contract (Count VI)**

26.    As to Count VI of the Complaint, [the DeMarcos] basically allege that they entered into express and implied contracts with Maui Beach Resort, including the Maui Purchase Agreements; and further, that Maui Beach Resort's conduct constitutes a breach of contract.

27.    In particular, [the DeMarcos] allege that [Appellees] breached the Hokulani and Konea sales contracts by failing to disclose certain "material changes," such as borrowing approximately $400 million more than was disclosed in the Maui Purchase Agreements.

28.    "Material change" is defined as a change in the project which directly, substantially and adversely affects the use or value of the condominium unit or the limited common elements appurtenant thereto or the amenities of the project available for purchaser's use and is not made pursuant to a right reserved to seller under the Declaration. See FOF No. 18.

29.    It is undisputed that the developer borrowed additional monies to finance the project that was constructed in phases, which right the developer reserved. It is also undisputed that as it pertains to the Konea Enclave, the [DeMarcos] as purchasers never received a request from the developer(s) to subordinate their interest to an amount greater than $242 million.  Neither Maui Beach Resort nor any of its lenders ever requested that [the DeMarcos] increase their subordination beyond the $242 million reflected in paragraph no. 37 of the Konea Sales Contract.

30.    [The DeMarcos] additionally argued that failure to adequately disclose the existence and presence of the STP and the adverse effect of the Nordic lien application constitutes a "material change," justifying their rescission of all three (3) Hokulani/Konea Sales Contracts.

31.    The credible evidence indicates that the existence of the STP was disclosed through numerous reports received by the [DeMarcos], that [the DeMarcos] recognized their independent duty to investigate adjacent properties to the project, that a lien was never attached to the project, and that the developer secured through Fidelity a $17 million bond confirming that if a mechanic's lien by Nordic Construction were to attach to the Hokulani Enclave, that Fidelity was prepared to issue title insurance policies to purchasers of units in Buildings SE-A, SE-B and SE-C in the Hokulani Enclave.

(continued...)

construction loan and the mechanic's lien application were not "material changes" that allowed the DeMarcos to rescind the sales agreements.

Regarding the increased construction loan, the DeMarcos explain that the sales agreements specified that Appellees were permitted to obtain a construction loan only up to $242,000,000 in order to build the Konea Enclave portion of the Honua Kai development. Appellees instead borrowed $305,000,000 to build the Konea Enclave, which the DeMarcos contend constituted a "material change." Additionally, the mechanic's lien application for $8,500,000 filed by Nordic Construction, Inc. was also a "material change" to the DeMarcos. Because of these "material changes,"

> [the DeMarcos] were concerned about the debt load of the Honua Kai project and the Nordic Mechanic's Lien application since they understood that when a subcontractor files an application for a Mechanic's Lien, it means either that (a) the Developer was not able to pay its subcontractors or (b) the subcontractor had performed substandard work.

In its Amended FOF 18, the circuit court recited the contractual definition of "material change":

> 18.     Incorporated and made part of the Hokulani Sales Contract was a Definitions Section attached as Exhibit A, defining "Material Change" to mean:
>
> > a change in the Project which (1) <u>directly, substantially and adversely affects the use or value of the Condominium Unit</u> or the Limited Common Elements appurtenant thereto or the amenities of the Project available for Purchaser's use, and (2) is not made pursuant to a right reserved to Seller under the Declaration.

The circuit court relied on this definition in concluding that the increased construction loan and the mechanic's lien applications were not "material changes" because the DeMarcos'

---

[5](...continued)
>      32.     Since neither the additional project financing, the extent of disclosure surrounding the STP, nor the Nordic lien application directly, substantially and adversely affected the use or value of the condominium unit, constituting a "material change," [the DeMarcos] failed to prove by a preponderance of the evidence their breach of contract claim, such as to justify their rescission of their Hokulani/Konea Sales Contracts.

use or value of their condominium units were not "directly, substantially, and adversely affected."

On appeal, the DeMarcos fail to make any argument or point to any evidence that demonstrates that the increased construction loan or mechanic's lien "directly, substantially, and adversely affected" the use or value of their condominium units. Without such evidence, we cannot conclude that the circuit court's FOFs were clearly erroneous or its COLs were wrongly decided. See Chun, 106 Hawai'i at 430, 106 P.3d at 353.

### IV. CONCLUSION

Therefore, the (1) "Order Granting Defendants Maui Beach Resort Limited Partnership and Northwest Maui Corporation's Motion to Amend to Clarify and Correct the Findings of Fact, Conclusions of Law, and Order, Filed April 21, 2015" entered on July 27, 2015; (2) "Order Granting in Part and Denying in Part Defendants Maui Beach Resort Limited Partnership and Northwest Maui Corporation's Motion for Attorneys' Fees and Costs, Filed August 20, 2015" entered on November 3, 2015; and (3) "Amended Final Judgment" entered on November 3, 2015 in the Circuit Court of the First Circuit is vacated as to the issue of actual damages and remanded for further proceedings consistent with this opinion, and affirmed in all other respects.

DATED: Honolulu, Hawai'i, November 10, 2016.

On the briefs:

Philip R. Brown
Effie Steiger
(Law Offices of Philip R. Brown)
for Plaintiffs-Appellants.

William C. McCorriston
Lisa W. Cataldo
Jessica M. Wan
(McCorriston Miller Mukai
MacKinnon)
for Defendants-Appellees.

Presiding Judge

Associate Judge

20